United States Courts
Southern District of Texas
FILED

*August 29, 2024*

Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 27 2024

CLERK, U.S. DISTRICT COURT
By_____ Deputy

UNITED STATES OF AMERICA

v.

HECTOR UBALDO (01)

No. 4:24-MJ-659

**4:24-mj-383**

## CRIMINAL COMPLAINT

I, Ava Vesling, being duly sworn hereby depose and say the following is true and correct to the best of my knowledge and belief.

Beginning on or about June 1, 2020, and continuing until on or about June 27, 2023, in the Fort Worth Division of the Northern District of Texas, and elsewhere, **Dr. Hector Ubaldo** did knowingly and intentionally conspire with co-conspirators, to solicit and receive illegal kickbacks in exchange for toxicology and blood laboratory testing of individuals insured by Medicare, a federally funded insurance program, in violation of 18 US.C. § 371 (Conspiracy to Solicit and Receive Illegal Kickbacks), and 42 U.S.C. § 1320a-7b(b)(l)(A) and 1320a-7b(b)(1)(B) (Soliciting and Receipt of Illegal Kickbacks).

## INTRODUCTION AND AGENT BACKGROUND

1.      I, Ava Vesling, am a Special Agent with the Federal Bureau of Investigation (FBI) and have held this position since April 2023.  I received training in conducting investigations and related legal matters at the FBI Academy in Quantico, Virginia.  I am currently assigned to the Dallas, Texas, District Office of the FBI.  Through my experience as an agent, I am familiar with the ways in which white-collar criminals conduct and coordinate their business utilizing office space, financial institutions, computers, email, electronic storage, etc.

During the course of my employment as an FBI Special Agent, I have participated in criminal investigations, to include health care fraud, and criminal investigative techniques, to include recorded conversations and analysis of financial records and claims data. Through such investigations and training, I have become familiar with the patterns and activities of individuals who engage in health care fraud, specifically illegal kickbacks.

2.      I have personally participated in the investigation set forth below and am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents of the FBI and other law enforcement and from my review of records and reports relating to the investigation.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent or another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

3.      I submit this affidavit in support of a criminal complaint and to secure an arrest warrant for **Dr. Hector Ubaldo**.  I have not included all of the facts known to me concerning this investigation but have set forth the facts and background I believe are necessary to establish probable cause to believe that **Ubaldo** and others, known and unknown, are engaged in activities related to illegal kickbacks.

Based upon the information below, I believe that **Ubaldo** has committed a violation of 18 US.C. § 371 (Conspiracy to Solicit and Receive Illegal Kickbacks), and 42 U.S.C. § 1320a-7b(b)(l)(A) and 1320a-7b(b)(1)(B) (Soliciting and Receipt of Illegal Kickbacks).

## OVERVIEW

4.      According to a Texas Secretary of State filing, dated September 10, 2014, **Ubaldo** is the owner of Hector Ubaldo, M.D., P.A. doing business as "Physicians of Katy," located at 462 South Mason Road, Suite 100, Katy, TX 77450.  According to Physicians of Katy's website,[1] **Ubaldo** opened Physicians of Katy in 1998 and specializes in Internal Medicine and Family Practice. As verified by the Texas Medical Board, **Ubaldo** is a licensed Physician in the State of Texas, with a license number of K0225, issued on June 22, 1996.[2]

5.      RK Clinical Solutions, LLC ("RK Clinical"), was an independent clinical diagnostic testing laboratory conducting business at 1145 W. Fairmont Dr., Tempe, AZ 85282.  RK Clinical was founded in approximately 2014, by two previously-indicted co-conspirators, Kelly Nelson and Renee Field.  (*See* Case Nos.  4:23-cr-321-Y and 4:23-cr-322-Y.)  RK Clinical was authorized by federal health care programs, including Medicare and Tricare, to perform laboratory testing services. RK Clinical performed toxicology and blood tests ordered by medical providers across the U.S., including the state of Texas, and in the Fort Worth Division.  RK Clinical ceased operations in approximately 2023, which was, in part, a result of the federal investigation.

---

[1]      https://www.physiciansofkaty.com (accessed as recently as 08/15/2024).
[2]      https://profile.tmb.state.tx.us (accessed as recently as 08/15/2024).

6.      Cirrus DX, Inc. ("Cirrus") was an independent clinical diagnostic testing laboratory conducting business at 9901 Belward Campus Drive, Suite 300, Rockville, MD 20850.  Cirrus was formed in 2019 and performed urinalysis testing.

7.      Redwood Lab Services, LLC ("Redwood") was a reference laboratory conducting business at 25321 Interstate 45 N Suite C, Spring, TX 77380.  Redwood contracted with Huntsville Memorial Hospital (HMH), who ran the actual tests for Redwood, and Redwood billed the insurance programs. Redwood primarily provided laboratory services for genetic testing sent by physicians.

8.      An individual identified here as G.M. was employed by RK Clinical as a marketer from approximately 2019 to 2022.[3]  In approximately May 2020, G.M. introduced **Ubaldo** to the services offered by RK Clinical, and **Ubaldo** began ordering certain toxicology tests for his patients to be performed by either RK Clinical, Cirrus, or Redwood in exchange for kickbacks.

## SUMMARY OF INVESTIGATION

9.      Beginning in approximately 2017, the FBI opened an investigation into several laboratory companies, medical marketers, and physicians for violations of the Anti-Kickback Statute.  The FBI has conducted this case as part of a joint investigation with the Department of Defense, Office of Inspector General, Defense Criminal Investigative

---

[3]      Earlier in the investigation, in or about July 2022, G.M. was approached by federal agents regarding his role in the scheme discussed herein.  G.M. agreed to cooperate with government agents and prosecutors and hopes to receive a more lenient outcome regarding his own criminal conduct.  To date, no promises have been made to G.M. regarding potential charges or sentencing.  G.M. has one prior conviction, from 2009, for misappropriation of a financial institution and was sentenced to five years of probation. This information is provided because certain allegations herein are based on information provided by G.M.

Service, U.S. Department of Health and Human Services, Office of Inspector General, and the U.S. Department of Veterans Affairs, Office of Inspector General.

10.     The investigation disclosed evidence of a multi-state, multi-organization kickback scheme in which laboratory companies and medical marketers engaged in quid-pro-quo relationships with medical providers that had the licenses, capabilities, and the willingness to order and refer laboratory tests for insurance beneficiaries (patients) in exchange for kickbacks. The laboratory companies and medical marketers utilized various methods such as professional service agreements, lease agreements, salary offset payments, and third-party payroll companies, to solicit, transfer, and launder these kickbacks to medical providers.   Fifteen related defendants have been prosecuted (convicted and sentenced) in the Fort Worth Division of the Northern District of Texas. (See Case Nos. 4:22-cr-34-O, 4:23-cr-320-Y, 4:23-cr-321-Y, 4:23-cr-322-Y, 4:23-cr-323-Y.)  As noted above, these include codefendants who operated RK Clinical who directly worked with **Ubaldo** in the conspiracy.  The original laboratory that was investigated by agents and found to be involved in this scheme was based in Fort Worth, Texas.    The marketer identified above as G.M. operated both inside and outside of the Fort Worth Division of Texas.   Claims that were predicated on kickbacks were submitted by conspirators from all over the Texas, including within the Fort Worth Division of the Northern District of Texas.

## SCHEME

11.     Between June 1, 2020, to June 27, 2023, a variety of laboratories submitted claims to insurance providers based on orders made by **Ubaldo** that were influenced by kickback arrangements.    For example, between May 2020, and December 2022, RK Clinical was paid $1,267,850 from insurance claims for orders sent in by **Ubaldo**.  These claims included over $354,000 in reimbursements by federal healthcare programs.   For example, as a result of **Ubaldo's** orders, RK Clinical received $149,000 in federal payments, Cirrus received over $167,000, and Redwood received over $37,000.

12.     **Ubaldo** sent these orders to these labs in exchange for kickbacks.  G.M., RK Clinical, and **Ubaldo** agreed to disguise kickback payments through various means, including cash payments, a professional services agreement, and other forms.   In all, **Ubaldo** was paid approximately $492,455.21 in kickbacks for his laboratory tests.[4]  Of that amount, over $14,000 was in the form of cash payments and $239,000 was in the form of purported payments for professional advisory services.

### A.  Cash Payments

13.     On or about July 19, 2022, **Ubaldo** met with G.M. at Physicians of Katy. During this meeting, G.M. paid **Ubaldo** $5,930 in cash based upon the volume and value of **Ubaldo's** clinical laboratory testing to a laboratory that G.M. selected.  Conversations between **Ubaldo** and G.M. regarding this arrangement were recorded and photographs of the cash were taken.

---

[4]     G.M. also received monthly commission payments from these laboratories based off a percentage of net collections from **Ubaldo's** laboratory tests.

The following are excerpts of the recorded conversation:

G.M.: …so we finally got Kelly, RK (ph.) to send us commission statements which I'm going to go over with you.
. . . .

G.M.: …so here's what I put together for you. I didn't have an envelope this time.

**Ubaldo**: Let me see.

G.M.: There's that. And then inside of there is a report. I just want to go through that with you.

**Ubaldo**: How much is in here?

G.M.: Okay. It's like 5930. It was 5928 but this is what I wanted to basically go over with you.

**Ubaldo**: Yeah.

**Later in the same conversation**

G.M.: I mean does Ruth (**Ubaldo's** employee) know about this arrangement we have?

**Ubaldo**: No.

G.M.: I know -- okay.

**Ubaldo**: No. I don't, I don't --

G.M.: I would prefer that nobody know that --

**Ubaldo**: No, no, no. No one --

G.M.: -- we're paying you for labs.

**Ubaldo**: They only know that you pay for stuff and then --

G.M.: Right. Which is normal stuff like the rent --

**Ubaldo**: And then rent, yeah.

14.     A little over a month later, on or about August 24, 2022, G.M. paid **Ubaldo** $3,580 in cash based upon the volume and value of **Ubaldo's** clinical laboratory testing to a laboratory that G.M. selected. **Ubaldo** was frustrated with the amount of money he was being provided, but he accepted the money, placing it in a soft leather, messenger style bag. Photographs of the cash were taken and conversations between **Ubaldo** and G.M. regarding this proposed arrangement were recorded.

15.     Approximately two months later, on or about October 19, 2022, G.M. paid **Ubaldo** $3,370 in cash in exchange for **Ubaldo** referring orders for clinical laboratory testing to a laboratory that G.M. selected.  **Ubaldo** again complained about the amount and demanded additional payments, stating that he needed to be paid at least $10,000 per month.  **Ubaldo** and G.M. discussed a professional services agreement as a vehicle to achieve these payments.  Conversations between **Ubaldo** and G.M. regarding this proposed arrangement were recorded. The following are excerpts of that recorded conversation:

> **Ubaldo**: Well, the problem we have to look at, at it this way. Let's look at it this way. You guys have to bring me numbers.
>
> G.M.: Yeah.
>
> **Ubaldo**: True numbers.
>
> G.M.: Well, which I have a difficult time getting.
>
> **Ubaldo**: Okay.
>
> G.M.: So.
>
> **Ubaldo**: So then I get -- so then I could say, because I'm a reasonable person, okay? I don't believe that I need to make all the money. I understand that there's three people involved in this, her, you. She has costs. You have costs.

G.M.: Right.

**Ubaldo**: You have to make money because you're the middle guy. I have to. I have to because I'm taking a risk here and stuff like that.

### Later in the same conversation

**Ubaldo**: I need -- to tell you the truth, I need the cash.

G.M.: Yeah.

**Ubaldo**: -- I need, I need that (indiscernible).

### Later in the same conversation

**Ubaldo**: -- this week. Because if not, then we just have to do something.

G.M.: No, I understand that.

**Ubaldo**: I have to go a --

G.M.: I completely understand that.

**Ubaldo**: -- I have to go a different route because this is not working for me.

G.M.: I understand.

**Ubaldo**: In that, that I can't, you know. I -- the minimum I'm willing to fucking take on a monthly basis is about 10 grand. I'm willing to push it up for you guys and make sure that you guys get whatever the 200 mark is that you think. . . .

16.    According to G.M., about a month later, on or about November 29, 2022, G.M. paid **Ubaldo** $1,610 in cash in exchange for **Ubaldo** referring orders for clinical laboratory testing to a laboratory that G.M. selected. **Ubaldo** and G.M. again discussed a professional services agreement as a vehicle to achieve these payments. **Ubaldo** complained about laboratories "making all of this money off of me" and threatened to cut off referrals unless a payment of at least $5,000 was made.

Criminal Complaint – Page 9

### B. *Professional Services Agreement*

17.     As noted above, **Ubaldo** often complained about the amounts of kickbacks he was receiving as being insufficient.  Individuals who operated RK Clinical, G.M., and **Ubaldo** agreed that they could utilize a professional services agreement as another vehicle to pay larger amounts of kickbacks and discussed this in recorded conversations.

18.     On or about August 24, 2022, G.M. and **Ubaldo** discussed a professional services agreement as a method of increasing revenue to **Ubaldo**.  But as **Ubaldo** knew, the professional services agreement would be a sham and he would perform no services in exchange for the medical directorship payments and would instead continue to submit orders for clinical laboratory testing to a laboratory that G.M. selected, including RK Clinical, and was making the medical directorship payments. Conversations between **Ubaldo** and G.M. regarding this proposed arrangement were recorded. The following are excerpts of one recorded conversation:

> G.M.: Well, so here's the thought. If I know -- like, what I need to do is go back to Kelly [the owner of RK Clinical] because she's open to the idea of bringing on a medical director, you know.
>
> **Ubaldo**: Right.
>
> G.M.: Obviously, I would come in here and, you know. It's -- if your performance is good and the labs are there. They've been getting back to normal, right? If we can continue down that road and we can get the revenue built up, I can pitch it to her to make you the medical director. Obviously, you're not gonna do anything. But you know, I'll come in here and we'll do hour sheets, whatever. We'll, you know, we'll forge those to do whatever we need to do. She doesn't give a shit. She just wants the labs.

19.     As discussed above, the conspirators planned to claim that **Ubaldo** would serve as a "Medical Director" or "Clinical Advisor" to a company controlled by G.M or by RK Clinical.  In reality G.M., as a marketer, who was not engaged in the provision of health care services, had no need for a Medical Director or Advisor and RK Clinical had no need for this position.

20.     The conspirators agreed to fabricate documentation, including the agreements between the parties and time sheets, to make it appear as though this was a legitimate arrangement and that **Ubaldo** was actually performing advisory services.  In reality, **Ubaldo** performed no such work and provided no advisory services.

21.     More specifically, on or about June 1, 2020, **Ubaldo** entered into a "professional services agreement" with an entity controlled by G.M.  Per the agreement, **Ubaldo** was supposed to provide consulting services to G.M.'s company in exchange for $7,000 a month.  In reality, **Ubaldo** provided no such services.

22.     On or about December 7, 2022, **Ubaldo** entered into a "professional services agreement" with RK Clinical. **Ubaldo** was supposed to provide consulting services to RK Clinical in exchange for $5,000 a month. In reality, **Ubaldo** provided no such services.

23.     In total, **Ubaldo** received approximately $239,000 for consulting services under his "professional services agreements" with the entity controlled by G.M. and RK Clinical. **Ubaldo** was paid from G.M. via check from Bank of America account ending x5147 by a business and account owned by G.M.  Agents have recovered copies of these checks and the memo lines typically read: "Medical Director Hours" indicating that these payments were for hours purportedly spent by **Ubaldo** in serving as the Medical Director this entity.  Each of these checks were deposited into **Ubaldo's** bank accounts.  An example of one such check is provided below:



24.     RK Clinical submitted the professional services kickbacks to **Ubaldo** through wire payments, including a $5,000 payment on December 16, 2022, and another $5,000 payment on January 24, 2023.

25.     In a text exchange, **Ubaldo** and G.M. discussed backdating the agreement between **Ubaldo** and RK Clinical.  **Ubaldo** demanded that the payment from RK Clinical be made at the beginning of each month and specifically discussed the connection between the samples he was sending to RK Clinical and the kickback payments, in the form of

"advisory" payments.  The following is a text message chain of the conversation. **Ubaldo**'s

texts are in grey and G.M. in blue.



26.     In December 2022, **Ubaldo** and G.M. discussed the "hours logs" to justify the professional services agreement payments. The following is a text message chain of the conversation. **Ubaldo**'s texts are in grey and G.M. in blue.



12/8/22, 7:32 AM

Can you scan the docs on and send them this morning? I need a w9 amd hours log as well, do you have a w9 already filled out? If not I can send you one

I will as soon as I get to office is she expecting for me to fill that time sheet every month

Yes she is.

U need 10 hours

She needs to do that.

Fuck I'm not

It's compliant if you do it bc you have to invoice get and that's the form

I need to speak to her directly.

27.     As referenced above, a telephonic conversation took place between G.M., **Ubaldo**, and Kelly Nelson (convicted conspirator who owned RK Clinical) on or about December 15, 2022, regarding the hours log.  G.M. requested that **Ubaldo** complete the "hours log" so that they could have a document justifying the payments to **Ubaldo**.  **Ubaldo** protested and stated that RK Clinical should complete his hours sheet for him, even though he was not working any hours or communicating to RK Clinical that he was working any hours.

28.     The following is an excerpt of the recorded conversation:

G.M.:  . . .  But I don't have the – hour sheet. So I don't know if you want to talk about that or --

**Ubaldo**: Right. Right. And -- and the hour sheet, uh, I -- I don't want to do that because I have so much on my plate. I mean there has to be something where you guys just fill that out, you get a copy of one with my signature underneath, and you just fill it out every month to have it in your -- in your coffers for just in case anything ever -- they ask about anything that is –

Nelson: Right.

**Ubaldo**: -- being done.

Nelson: Okay

**Ubaldo**: Okay

Nelson: And that's and that is -- for just documented -- you know documented purposes.

**Ubaldo**: Right. And it's just I -- it's just -- it's just -- it's just to cover you and to cover myself. I understand.

Nelson: Correct. Correct.

**Ubaldo**: I just -- I just don't -- I just don't have -- you know, with all -- with all what's going on around here and reimbursements and fighting with insurances and not having good employees and not having anybody to assist me, my plate is full right now. More than full.

Nelson. Okay

**Ubaldo**: To even take off something that small is detrimental for me because you leave it off to the side and before you know it, tam- -- time has gone by and you haven't gotten to it because there's more important things that I need to get to.

29.     After the conversation with **Ubaldo**, Nelson and G.M. had a separate conversation. The following is an excerpt of the recorded conversation:

> G.M.: so I've got to go t- -- okay, let's go over the samples and this and the commissions. I don't (indiscernible) my box, but --
>
> Nelson: So, um -- oh, I haven't uploaded it. Sorry. Let me --
>
> G.M.: Oh, that's okay.
>
> Nelson: -- um, let me upload it for you real quick. So I haven't put Ubaldo in here. Um --
>
> G.M.: Oh, you can pu- -- upload it later if you just want to verbalize it right now.
>
> Nelson: Okay. All right. Perfect. Okay.
>
> G.M.: Yeah.
>
> Nelson: So, um, Ubaldo, um, he actually -- so last month was 16,800. This month --
>
> G.M.: Okay.
>
> Nelson: -- was 26,200.
>
> G.M.: Okay. Better.
>
> Nelson: So better. Much better. Um, his numbers for October were 164 and his numbers for November were 194.
>
> G.M.: Okay.
>
> Nelson: And he's already done --
>
> G.M.: Good.
>
> Nelson: -- 127 this month.
>
> G.M.: Beautiful.

Nelson: So he is doing what he said he would do.

G.M.: Okay. Good. Thank God.

Nelson: Um, so his commission for his part would have been about $5,200.

G.M.: Okay.

30.     Later, **Ubaldo** signed a "Medical Director/Consultant Activity Log" before it was completed so that it could be used to justify payments to **Ubaldo**.  The Medical Director/Consultant Activity Log had blank spaces to fill out date of invoice, medical director name, medical director address, dates of service, number of hours, service code and descriptions to justify the hours logged, total hours worked, invoice amount, and date. The signature space for medical director was already completed with **Ubaldo's** signature.

31.     **Ubaldo** would often get angry when kickback payments were late.  On January 16, 2023, in a text message, **Ubaldo** texted G.M. about not being paid by RK Clinical. The following is a text message chain of the conversation. **Ubaldo**'s texts are in grey and G.M. in blue.



### C. *Pressure Regarding Payments and Efforts to Hide Criminality*

32.     Throughout their relationship, G.M. and **Ubaldo** exchanged text messages with each other.  **Ubaldo** would ask G.M. about payments if G.M. did not get payments to **Ubaldo** soon enough, showing **Ubaldo's** concern about getting paid.  Often, after G.M. and **Ubaldo** discussed their illegal kickback arrangement, **Ubaldo** requested that G.M. delete all of their texts.

33.     For example, on July 6, 2022, in text message, **Ubaldo** asked for G.M. to erase text messages and expressed frustration about not getting compensation or payments for the toxicology samples he was providing to the labs. The following is a text message chain of the conversation. **Ubaldo**'s texts are in grey and G.M. in blue.



### D. *Evidence Related to Other Planned Schemes*

34.     In July 2022, **Ubaldo** and G.M. discussed a clinic that advertised providing an onsite visit with a doctor for $99.   This advertising appeared to be aimed at undocumented immigrants.    In reality, as they discussed, the "doctors" were nurse practitioners and non-licensed individuals from other countries.

35.     As discussed by **Ubaldo**, after an undocumented immigrant was seen by the alleged doctor, the clinic then added additional costs, such as blood samples and x-rays. The undocumented immigrants were targeted and charged significantly higher than the cost advertised. The following are text messages between **Ubaldo** and G.M. about these clinics. **Ubaldo**'s texts are in grey and G.M. in blue.

7/28/22, 7:35 PM

http://clinicahispanasanantonio.com

Popping up all over San Antonio

I told you the place any one there they do telemedicine

There's no pricing on website

But they have like 20 locations in San Antonio

They all look a little sketchy

That's how they get you

I wish I could sponsor them





They are dumpy locations but clean inside

How do we start this on our own?

We have to get NPs or doctors from other countries

> And then how does it work with TMB?  Even though we wouldn't take insurance

Nothing it's always telemedicine

> Ok.

> I'll be coming by around the 15th next month.  I may come in before if I can get some answers on new testing I'm looking into

Female Dr here was sponsoring 20 at 4K a month

Ok. We have to do something soon.

> Yes I agree.

That was 80k a month without doing anything

## CONCLUSION

36.     Based upon the above listed facts, your Affiant, I believe probable cause exists that Defendant, **Dr. Hector Ubaldo**, in the Fort Worth Division of the Northern District of Texas, and elsewhere, did knowingly and intentionally conspire and engage in a scheme to solicit and receive illegal kickbacks in exchange for sending toxicology and blood laboratory referrals for patients covered by Medicare, a federally funded health insurance program, in violation of 18 US.C. § 371, and 42 U.S. C. § l320a-7b(b)(l )(A) and 1320a-7b(b)(1)(B).

_____
Ava Vesling
Special Agent, FBI

Subscribed and sworn before me this the **27TH** day of August 2024 at **2: 32** a.m. (p.m.) in Fort Worth, Texas.

_____
HAL R. RAY, JR.
UNITED STATES MAGISTRATE JUDGE